ACCEPTED
07-14-00407-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
3/17/2015 12:30:14 PM
Vivian Long, Clerk

No. 07-14-00407-CR

IN THE COURT OF APPEALS

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS

FOR THE SEVENTH SUPREME JUDICIAL DISTRICT

3/17/2015 12:30:14 PM

OF TEXAS AT AMARILLO

VIVIAN LONG
CLERK

_____

AMADOR RODRIGUEZ,

                                   Appellant

v.

THE STATE OF TEXAS,

                                   Appellee

FROM THE 140th DISTRICT COURT OF LUBBOCK COUNTY, TEXAS
HON. JIM DARNELL, JUDGE PRESIDING
_____

APPELLANT'S BRIEF
_____

March 17, 2015

KAREN JORDAN
ATTORNEY FOR THE APPELLANT
SBN:  11004950
CROOK & JORDAN
PO Box 94590
Lubbock, TX 79493
(806) 744-2082
FAX:  (806) 744-2083

JEFF FORD
ATTORNEY FOR THE APPELLEE
SBN:  24047280
OFFICE OF THE DISTRICT ATTORNEY
LUBBOCK COUNTY
PO Box 10536
Lubbock, TX 79408-3536

**APPELLANT WAIVES ORAL ARGUMENT**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to the requirements of T.R.A.P. 38.1(a), Appellant certifies that the following is a complete list of parties and counsel:

| PARTIES | COUNSEL |
|---|---|
| a. AMADOR RODRIGUEZ, Appellant<br>TDCJ#1967304<br>Middleton Unit<br>13055 FM 3522<br>Abilene, TX 79601 | Karen Jordan<br>Crook & Jordan<br>PO Box 94590<br>Lubbock, TX 79493<br>SBN: 11004950<br>(806) 744-2082<br>FAX: (806) 744-2083<br>dcrook@nts-online.net<br>Attorney for Appellant |
| b. The State of Texas, Appellee | Jeff Ford<br>Assistant Criminal District Attorney<br>Lubbock County, Texas<br>SBN: 24047280<br>P.O. Box 10536<br>Lubbock, TX 79408<br>(806) 775-1100<br>FAX: (806) 767-1118<br>Attorney for the Appellee |

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL.............................................................................2

TABLE OF CONTENTS……………………………………………………..3

INDEX OF AUTHORITIES................................................……………….4

STATEMENT OF THE CASE......................................................…………….9

ISSUES PRESENTED...................................................................................10

**POINT ONE: THE TRIAL COURT ERRED IN LETTING THE CASE GO TO THE JURY ON GUILT-INNOCENCE, AS THE EVIDENCE WAS INSUFFICIENT TO SHOW A LAWFUL ARREST OR DETENTION**.

**POINT TWO: THE TRIAL COURT ERRED IN INCLUDING A SPECIAL ISSUE ON APPELLANT'S USE OR EXHIBITION OF A DEADLY WEAPON IN THE JURY CHARGE, EGREGIOUSLY HARMING APPELLANT, AS INCLUSION OF THE DEADLY WEAPON ISSUE VIOLATED LEGISLATIVE INTENT AS PER SECTION 38.04 OF THE PENAL CODE.**

**POINT THREE:  THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY, S1, A RECORDING OF A 911 CALL, THEREBY HARMING APPELLANT.**

**POINT FOUR: THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY, S2, A RECORDING OF A 911 CALL, THEREBY HARMING APPELLANT**.

**POINT FIVE.  THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY COMMITTING TWO SERIOUS ERRORS IN THE CONDUCT OF THE GUILT-INNOCENCE TRIAL THAT COLLECTIVELY AMOUNTED TO CUMULATIVE ERROR**.

STATEMENT OF FACTS…………………………………………………………11

SUMMARY OF THE ARGUMENT………………………………......................21

ARGUMENT AND AUTHORITIES……………………………………………...23

CONCLUSION AND PRAYER.........................……….......................46

 CERTIFICATE OF COMPLIANCE RE T.R.A.P. 9.4(i)(3)…………………………………47

CERTIFICATE OF SERVICE…………………………………………………47

# INDEX OF AUTHORITIES

Page

**CONSTITUTIONAL PROVISIONS**

U.S. CONST. Amend. IV………………………………………………………………27,38

U.S. CONST. Amend. V………………………………………………………………..44

U.S. CONST. Amend. VI………………………………………………………………41

U.S. CONST. Amend. XIV……………………………………………………………..44

**FEDERAL CASES**

*Brown v. Texas*, 433 U.S. 47, 52 (1979)…………………………………………..27

*Crawford v. Washington*, 541 U.S. 36 (2004)………………………………………40,43

*Florida v. Bostick*, 501 U.S. 429 (1991)…………………………………………..28

*Florida v. Royer*, 460 U.S. 491, 497-498 (1983)…………………………………27

*Jackson v. Virginia,* 443 U.S. 307, 319 (1979)…………………....................26

*Menzies v. Procunier*, 743 F.2d 281 (5th Cir.1985)……………………………………44

*Terry v. Ohio*, 392 U.S. 1, 19-27 (1968)…………………………………………27

*U.S. v. Canales*, 744 F.2d 413 (5th Cir. 1984)…………………………………………44

*U.S. v. Diharce-Estrada*, 526 F.2d 637 (5th Cir. 1976)………………………………44

*U.S. v. Munoz*, 150 F.3d 401, (5th Cir. 1998)……………………………………44

*U.S. v. Reedy*, 304 F.3d 358 (5th Cir. 2002)……………………………………44

**STATE STATUTES**

TEX. CRIM. PROC. Art. 36.19……………………………………………..32 ,33

TEX. CRIM. PROC. Art. 38.23……………………………………………………38

TEX. PENAL CODE § 12.35(c)(1)………………………………………………………36

TEX. PENAL CODE § 38.03………………………………………………………………35

TEX. PENAL CODE § 38.04………………………………………………..26,33,34,36,42,45

TEX. R. APP. P. 44.2(a)……………………………………………………………….45

TEX. R. APP. P. 44.2(b)………………………………………………………………41,42

TEX. R. EVID. 801…………………………………………………………………...39,40

TEX. R. EVID. 802…………………………………………………………………..39

TEX. R. EVID. 803(2)………………………………………………………………..41

**STATE CASES**

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)………………………….33

*Anderson v. State*, 2004 WL 1202982 (Tex. App.—Tyler 2004, pet. ref'd)…………………34

*Armstrong v. State*, 550 S.W.2d 25, 30-31 (Crim. App. 1977)……………………………….28

*Barshaw v. State*, 342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011)……………………………41

*Blount v. State*, 965 S.W.2d 53, 54-55 (Tex. App.—Houston [1ˢᵗ Dist.] 1998, pet. ref'd)………30

*Chamberlain v. State,* 998 S.W.2d 230, 238 (Tex. Crim. App. 1999), *cert. den.* 528 U.S. 1082 (2000)……………………………………………………………………….45

*Conner v. State*, 712 S.W.2d 259 (Tex. App.—Austin 1986, pet. ref'd), *rev'd on other grounds*, *Woods v. State*, 956 S.W.2d 33 (Tex. Crim. App. 1997)………………….…..28

*Cook v. State*, 1 S.W.3d 722 (Tex. App.—El Paso 1999, no pet.)……………………………..31

*Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010)…………………………………..28

*Davis v. State*, 947 S.W.2d 240, 246 (Tex. Crim. App. 1997)………………………………..29

*Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995)……………………………..39,40

*Drichas v. State*, 175 S.W.3d 795 (Tex. Crim. App. 2005)…………………………………..34

*Edwards v. State*, 313 S.W.2d 618, 619 (Tex. Crim. App. 1958)……………………………..35

*Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. 2002)……………………………………..45

*Fowler v. State*, 958 S.W.2d 853, 865 (Tex. App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999)………………………………………………………………41,42

*Garza v. State*, 988 S.W.2d 352, (Tex. App.—Fort Worth 1999), *rev'd on other grounds*, 7 S.W.3d 164………………………………………………………………….36

*Garza v. State*, 298 S.W.3d 837 (Tex. App.—Amarillo 2009, no pet.)………………………40

*Girard v. State*, 631 S.W.2d 162, 164 (Tex. Crim. App. 1982)…………………………………39

*Gurrola v. State*, 877 S.W.2d 300, 303 (Tex. Crim. App. 1994)……………………………28,30

*Howeth v. State*, 645 S.W.2d 787, 788 (Tex. Crim. App. 1983)……………………………..26,31

*Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)…………………………………..41

*Johnson v. State*, 414 S.W.3d 184, 191 (Tex. Crim. App. 2013)……………………………27,29

*Klein v. S*tate, 191 S.W.3d 766 (Tex. App.—Fort Worth, no pet.)…………………………………41

*Lacaze v. State*, 346 S.W.3d 113 (Tex. App.—Houston 2011, pet. ref'd)……………………..40,41

*Langston v. State*, 827 S.W.2d 907, 910 (Tex. Crim. App. 1992)………………………………38

*Lyle v. State*, 418 S.W.3d 901 (Tex. App.—Houston (14th Dist.) 2013, no pet.)………………..40

*McVickers v. State*, 874 S.W.2d 662, 664 (Tex. Crim. App. 1993)……………………………..40

*Martinez v. State*, 883 S.W.2d 771 (Tex. App.—Fort Worth 1994, pet. ref'd)………………35,36

*Mendoza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 2014)………………………………33

*Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)……………………………..33

*Milton v. State*, 549 S.W.2d 190 (Tex. Crim. App. 1977)………………………………………28

*Motilla v. State*, 78 S.W.3d 353, 355-7 (Tex. Crim. App. 2002)………………………………41

*Narron v. State*, 835 S.W.2d 642, 644 (Tex Crim. App. 1992)……………………………34,37

*Ortiz v. State*, 577 S.W.2d 246, 250 (Tex. Crim. App. 1979)……………………………..26,31

*Patterson v. State*, 769 S.W.2d 938, 940 (Tex. Crim. App. 1989)………………………………34

*Patterson v. State*, 980 S.W.2d 529 (Tex. App.—Beaumont 1998, no pet.)……………………39

*Pickens v. State*, 159 S.W.3d 272, 273-274 (Tex. App.—Amarillo, 2005, no pet.)………….26,30

*Pope v. State*, 695 S.W.2d 341, 344 (Tex. App.—Houston [1st Dist.] 1985, pet. ref'd)…………29

*Rodriguez v. State*, 576 S.W.2d 419 (Tex. Crim. App. 1979)………………………………30,31

*Rogers v. State*, 832 S.W.2d 442 (Tex. App.—Austin 1992, no pet.)……………………………...33

*Sims v. State*, 99 S.W.3d 600 (Tex. Crim. App. 2003)……………………………………………..26

*State v. Brown*, 314 S.W.3d 487 (Tex. App.—Texarkana 2010, no pet.)…………………34,35,36

*State v. Fudge*, 42 S.W.3d 226, 231 (Tex. App.—Austin 2001, pet. ref'd)……………………..29

*State v. Garcia-Cantu*, 253 S.W.3d 236, 238 (Tex. Crim. App. 2008)……………………...27,28

*State v. Woodard*, 341 S.W.3d 404, 411-412 (Tex. Crim. App. 2011)…………………………..27

*Stewart v. State*, 22 S.W.3d 646 (Tex. App.—Austin 1986, pet. ref'd)…………………………29

*Thomas v. State*, 137 S.W.3d 792, 796 (Tex. App.--Waco 2004, no pet.)………………………41

*Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002)………………………………..39,40

*Urick v. State*, 662 S.W.2d 348, 349 (Tex. Crim. App. 1984)…………………………………..40

*Woods v. State*, 956 S.W.3d 33 (Tex. Crim. App. 1997)………………………………………...28

*Woods v. State*, 153 S.W.3d 413, 415 (Tex. Crim. App. 2005)……………………………..26,42

*Wright v. State*, 28 S.W.3d 526 (Tex. Crim. App. 2000)………………………………………..45

No. 07-14-00407-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH SUPREME JUDICIAL DISTRICT

OF TEXAS AT AMARILLO
_____

AMADOR RODRIGUEZ,

Appellant

v.

THE STATE OF TEXAS,

Appellee

FROM THE 140th DISTRICT COURT OF LUBBOCK COUNTY, TEXAS
HON. ABE LOPEZ, SITTING BY ASSIGNMENT, JUDGE PRESIDING
_____

APPELLANT'S BRIEF
_____


**TO THE HONORABLE COURT OF APPEALS**:

AMADOR RODRIGUEZ, Defendant in Cause Number 2014-402,814, in the 140th District Court of Lubbock County, Texas, the Hon. Abe Lopez sitting by assignment and presiding at trial, and Appellant before the Court of Appeals, respectfully submits this Brief in support of his appeal.

Pursuant to Rule 3.2 of the Texas Rules of Appellate Procedure, the parties will be referred to as "Appellant" and the "State."

## STATEMENT OF THE CASE

On July 2, 2014, Appellant was charged in a single-count indictment in Cause Number 2014-402,814, in the 140th District Court of Lubbock County. He was charged under Penal Code § 38.04(b)(1)(B) with Evading Arrest or Detention [using a vehicle]. The indictment also averred that Appellant used and exhibited a deadly weapon, a vehicle, and the alleged victim was Charles Holt. The offense date alleged was June 28, 2014. The indictment included two enhancement paragraphs, one for a 1990 conviction for Voluntary Manslaughter, and the second for Possession of Controlled Substance with Intent to Deliver, an offense from 2005 (Clerk's Record ["CR"] p. 7).

A non-evidentiary pretrial hearing was held in the case on February 14, 2014 before the Honorable Jim Darnell of the 140th District Court. The Trial Court actually called two cases for pretrial, the cause numbers being 2013-439,259 and 2013-439,260 at the time. The State identified 2013-439,260 as being the Evading charge (Reporter's Record "RR" v. 2, p. 4). The usual State's motions were heard. The State asserted that the range of punishment, with the two enhancement paragraphs, was 25 to 99 years or life (RR v. 2, pp. 5-6).

Appellant filed a punishment election, choosing to have punishment assessed by the Court (RR v. 2, p. 7, CR p. 43). Appellant also field a motion to require the State to reveal any agreements with witnesses, which the Court granted (RR v. 2, p. 8).

On July 8, 2014, defense counsel filed her *Motion for Competency Examination* (CR pp. 8-10). On July 15, 2014, the Court filed its Order for Competency Examination of Defendant (CR pp. 16-18). The competency exam was duly performed, as reflected in the Clerk's Record (Sealed), a part of the record in the Cause. The Clerk's Record (Sealed) viewed *in toto* shows that Ms. Miranda Higgins, a licensed Psychologist, examined Appellant on July 16, 2014, and (from her report, part of the sealed record) found him competent to stand trial. The parties

9

executed an Agreed Judgment of Competency, signed by the Honorable Drue Farmer and filed of record on August 26, 2014 (CR pp. 19-20).

Appellant's jury trial on guilt-innocence commenced on November 17, 2014, before the Honorable Abe Lopez, sitting by assignment (RR v. 3). Appellant was convicted on February 18, 2014 (RR v. 4, p. 129). The jury also made an affirmative finding of the use of a deadly weapon on Appellant's part (RR v. 4, p. 130).

Sentencing proceedings commenced immediately after Appellant's conviction. After hearing the evidence, the Court [the Honorable Ape Lopez] sentenced Appellant to forty-five (45) years imprisonment in the Texas Department of Criminal Justice, Institutional Division (RR v. 4, p. 156, CR pp. 62-65).

After the trial, the Court dismissed Cause No. 2013-439,260, the earlier incarnation of the case before it was re-indicted. Appellant perfected appeal on November 21, 2014 (CR p. 106).

**ISSUES PRESENTED; POINTS OF ERROR**

POINT ONE: THE TRIAL COURT ERRED IN LETTING THE CASE GO TO THE JURY ON GUILT-INNOCENCE, AS THE EVIDENCE WAS INSUFFICIENT TO SHOW A LAWFUL ARREST OR DETENTION.

POINT TWO: THE TRIAL COURT ERRED IN INCLUDING A SPECIAL ISSUE ON APPELLANT'S USE OR EXHIBITION OF A DEADLY WEAPON IN THE JURY CHARGE, EGREGIOUSLY HARMING APPELLANT, AS INCLUSION OF THE DEADLY WEAPON ISSUE VIOLATED LEGISLATIVE INTENT AS PER SECTION 38.04 OF THE PENAL CODE.

POINT THREE: THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY, S1, A RECORDING OF A 911 CALL, THEREBY HARMING APPELLANT.

POINT FOUR: THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY, S2, A RECORDING OF A 911 CALL, THEREBY HARMING APPELLANT.

POINT FIVE. THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY COMMITTING TWO SERIOUS ERRORS IN THE CONDUCT OF THE GUILT-INNOCENCE TRIAL THAT COLLECTIVELY AMOUNTED TO CUMULATIVE ERROR.

## STATEMENT OF FACTS

Before jury selection the State forwarded to the Court a motion to dismiss "the previous cause number" in which Appellant had been indicted [Cause No. 2013-439,260]. The State also moved that all previous motions from that case be transferred to the 2014 case and that the rulings on the motions likewise be retained. Appellant had no objection to those motions. However, the defense noted that it was now going to the Court rather than to the jury for punishment. The State also addressed the issue of what phase to put on the deadly weapon issue in, and suggested that it be done in guilt-innocence phase. Appellant did not object to this, and the Court agreed (RR v. 3, pp. 4-5).

After jury selection, the State read the indictment and Appellant entered his plea of not guilty. After opening statements by both parties, the State's first witness was Ms. Christy Hennsley. She testified that she was the Communications Center manager for the Lubbock Police Department, and also the custodian of records for LPD. She and her colleagues answer 911 and non-emergency calls and make up "the central call center" of LPD (RR v. 4, p. 14). Ms. Hennsley proceeded to authenticate S1 and S2, recordings made of incoming 911 calls. Appellant entered a hearsay objection to the calls, and also claimed to have received only S1 of in pretrial discovery, specifying that the defense had gotten a copy of the call pertaining to one Andrea Leyva, but not that of B. J. [Brendan] Glenn. The State then moved to admit S1, reserving the matter of S2. Over the hearsay objection, the Court admitted S1. The State proceeded to publish S1 (RR v. 4, pp. 15-16).

The State then called Officer John Willhelm of LPD (RR v. 4, p. 17). After the usual preliminaries regarding training and experience, the State asked Willhelm about the night of June 28, 2013 (RR v. 4, p. 20). Willhelm said that he was making his rounds, driving his marked

patrol car and wearing the usual LPD uniform. He was working alone (RR v. 4, p. 21).

Willhelm got a call to the 7-Eleven at 2608 Ave. Q at about 2:40 in the morning A male and a female in a blue pickup were supposedly arguing and/or physically fighting at the gas pumps. The male was Hispanic and wearing a red shirt (RR v. 4, pp. 21-22). Initially, on arrival, Willhelm did not see a blue pickup on the premises. Upon exiting his vehicle, he did see a blue pickup. He also saw a new arrival, Officer Holt, pull up behind a 2006 blue Chevy Trail Blazer (RR v. 4, p. 22-23). Willhelm then stated that the blue pickup went into reverse. Without drawing a Rule 602 or Rule 701 objection, he testified that from what he saw "the vehicle tried to ram Officer Holt as Officer Holt was attempting to park behind the vehicle" (RR v. 4, pp. 23-24). Although the incident happened at night about a year and a half before, Willhelm stated that he could identify the driver of the pickup from his fleeting glimpse of him as he drove off that night after trying to ram Holt's vehicle (RR v. 4, p. 24). The State wanted more detail from Willhelm other than his lightning-quick assertion of malfeasance about the attempt to ram and returned to the topic to get it. Willhelm reiterated that as Holt was parking behind the suspect vehicle, the suspect vehicle "was attempting to ram" Holt's car by going into reverse. Holt honked and backed up and the attempt to ram (if such it was) fizzled out rapidly (RR v. 4, p. 25). Then, the blue pickup drove by Willhelm, coming close enough to force him to "push off" (?) the vehicle, that is, to touch the blue pickup so as to avoid contact (?) [RR v. 4, p. 26). Holt left in pursuit in his car, and Willhelm got into his police car and followed the suspect vehicle. Willhelm couldn't catch up to either the hound or the hare in this chase. He eventually heard from Holt's signals that a female had exited the vehicle in the 1800 block of Ave. W (RR v. 4, p. 27). Willhelm spotted a woman he took to be the one referenced by Holt and told her to go to the McDonald's across the street and wait. He then continued the pursuit, but never caught up.

He went back to McDonald's, but found that the female had bolted. He looked for her without success (RR v. 45, p. 29). Willhelm then scrutinized the call sheet and was able to come up with an address for the suspect vehicle's owner. The address in question was 2206 15th Street. Willhelm repaired to those premises (RR v. 4, p. 30). Willhelm noted that suspects often have a [unaccountable] belief to the effect that being in their residence affords some protection from police scrutiny. However, when he went to the address, Appellant did not seem to be there (RR v. 4, p. 31). Willhelm repeated some evident hearsay to the effect that a Melissa Cortez had been involved in the fracas at the 7-Eleven. He identified the 7-Eleven clerk as Andrea Leyva (RR v. 4, p. 32). Also, the 911 call originated from a Brendan Glenn, and Willhelm contacted him by phone (RR v. 4, p. 32). Willhelm quickly concurred with the State that a motor vehicle is capable of being a deadly weapon (RR v. 4, pp. 32-33). He also agreed with the State that Appellant was using his vehicle as a deadly weapon against he, Willhelm (RR v. 4, p. 33).

On cross, Willhelm said that he did not have his lights and sirens on when pulling into the 7-Eleven (RR v. 4, pp. 33-34). He said that when he pulled into the store, he saw nothing going on there (RR v. 4, p. 34). No vehicles were parked at the pumps, and there was no fight in progress (RR v. 4, pp. 34-35). No one was flagging him down or trying to get his attention, and whatever Homeric row had been going on at the pumps had faded into oblivion. He had only an uncorroborated complaint from some public-spirited unknown individual (RR v. 4, p. 35). On redirect Willhelm said that his only description of the vehicle was that it was a "blue pickup," and the only description of the suspect (?) was of a "Hispanic male wearing a red shirt" (RR v. 4, p. 36). He said that if events had occurred differently and the suspect had stayed on the scene, he would have been "temporarily detained" for Willhelm to investigate the matter (RR v. 4, p. 37).

The State's next witness was Officer Charles Holt of LPD (RR v. 4, pp. 37-38). After the

ritual testimony about training and experience, the State brought up the night of June 28, 2013. Holt was working patrol in central Lubbock (RR v. 4, p. 39). His "zone" was University and to I-27; and 19th Street, to Loop 289. He was wearing his uniform and driving his marked patrol car. About 2:40 in the morning, he responded to a call re a "domestic disturbance" at 7-Eleven, 2608 Ave. Q (RR v. 4, p. 40). He got the same "basic call sheet" that Willhelm did, regarding a possible fight, with the subject in a blue vehicle on the east side of the parking lot (RR v. 4, pp. 40-41). He did not remember it as pertaining to a Hispanic male, and recalled no clothing description. He testified that when he entered the parking lot he saw a blue vehicle in the lot. Willhelm was already there, walking through the lot. Holt pulled behind the blue vehicle, intending to chat up the driver (RR v. 4, pp. 41-42). Holt described the blue vehicle as a SUV. He got behind it to block it, "assuming that that was most likely the vehicle." When he did this, the blue vehicle went into reverse, backing up towards Holt's vehicle (RR v. 4, p. 42). In response to a leading question Holt agreed with the State that he was "afraid" and stated that he had to back up slightly while honking his horn (RR v. 4, pp. 42-43). The blue vehicle backed up enough to be able to turn around and face southbound. At that point it headed towards Officer Willhelm (RR v. 4, p. 43). Holt's emergency lights were not on at that time (RR v. 4, p. 43). Holt said he saw Willhelm holding his flashlight and holding his hands up to get the driver to stop (RR v. 4, p. 43). Holt claimed he saw Willhelm "jump out of the way of the vehicle." It continued southbound. As Holt was exiting the parking lot he saw a female trying to get out of the car, with someone pulling her back in (RR v. 4, p. 44). Holt pursued the blue SUV (?) as it left the parking lot. By then he had his emergency lights activated. When he realized the car wasn't going to stop he activated the sirens. His MVR was functioning (RR v. 4, p. 45). The suspect driver was driving recklessly, and ran several stop signs, as well as red lights (RR v. 4, p.

14

45). Most of the pursuit took place in a residential area (RR v. 4, p. 46). Holt called the suspect's speed excessive, and then said it approached 60 miles an hour. The pursuit ended in the 2000 block of 28th Street, where some sewer or water lines were being repaired. The suspect hit one of several large dirt mounds from work excavation. Holt claimed the suspect car "went airborne." It struck some other cars and then stopped (RR v. 4, pp. 46-47). Holt's best guess was that the suspect vehicle and two others it hit were all totaled (RR v. 4, p. 47). When Holt got to the wrecked suspect vehicle, the driver was not there. Holt first thought the driver and any passenger had been ejected. He searched the immediate area. The driver was not there (RR v. 4, p. 48). The smashup had attracted some spectators, and one of them told Holt and the other officers who were present by then that somebody had been running northbound (RR v. 4, p. 49). Eventually the suspect was located and EMS called. Appellant went to the hospital. Holt described automobiles in terms reminiscent of gigantic Krupp shells from the Wilhelmine era, or something fired from an Austrian 320 mm. siege gun to flatten Liege, in the deadly weapon context (RR v. 4, p. 51). Holt claimed that Appellant used his vehicle as a battering ram to force Officer Willhelm out of the way; only "divine intervention" [Holt's phrase] protected Willhelm from being "seriously injury or killed" (RR v. 4, p. 52). Holt claimed that there was an unrestrained female in the suspect vehicle, although it was not clear from the context how he could be sure the passenger didn't use her seatbelt after the car exited the convenience store (RR v. 4, p. 52). Holt then authenticated the MVR [mobile video recorder] from his vehicle (RR v. 4, pp. 54-55). This item was admitted into evidence, as apparently, S3, and the State proceeded to begin to publish it (RR v, 4, p. 55). Holt said that the pursuit lasted 6-7 minutes (RR v. 4, p. 57). The State walked Holt through the video (RR v. 4, pp. 58-59). Holt, watching the video, asserted that it showed Appellant running one or more red lights and two stop signs (RR v. 4, pp. 59-61).

Eventually, the suspect car stopped and the female found urgent business elsewhere, out of the car (RR v. 4, p. 62). For a moment, Holt thought the chase was over. Then, the chase resumed (RR v. 4, p. 63). At some point in Overton, Appellant turned off his headlights (RR v. 4, p. 64). Eventually Appellant hit a curb and went through someone's front lawn. Appellant then ran another stop sign and another red light (RR v. 4, p. 65). At one point, Holt reached a speed of 100 miles an hour; he claimed Appellant was going even faster. Appellant then hit the construction mound and attained momentary levitation (RR v. 4, pp. 66-67). The vehicle chase ended. Holt authenticated various photos of the post-chase scene, S4 through S23. These were admitted without objection (RR v. 4, p. 68).

With the jury out, originally on a brief recess, the State re-offered and urged the admission of S2, one of the 911 calls. Out of the presence of the jury Appellant restated the hearsay objection and added a *Crawford*-style Confrontation Clause objection, saying that the State apparently did not have a live witness to be cross-examined regarding the call (RR v. 4, p. 69). The State described the call as coming from a spectator to the physical fight in the parking lot of the convenience store. The State explained that the caller as per S2, apparently, was B. J. Glenn, while the first called came from Andrea Leyva. The Court sustained Appellant's objection (RR v. 4, p. 71). The State re-urged its need for getting the item in evidence, to counter the defense strategy. The Court weakened, and ended by overruling Appellant's objections to the item being put before the jury (RR v. 4, p. 73).

With the jury back in, the State did not immediately play the 911 recording. With the jury back in, the State began by showing the still photos to Holt, and publishing them to the jury (RR v. 4, p. 74). The State went through the photos in some detail (RR v. 4, pp. 74-78).

On cross, Holt wobbled a bit about whether the video really showed the suspect vehicle

nearly striking his, or just backing up to leave the parking area (RR v. 4, p. 79). Holt saw no brawl in progress, and no one was flagging him down. Holt allowed he had no probable cause to arrest anyone, but claimed in effect that he had reasonable suspicion, and enough of it to detain someone (RR v. 4, p. 80). Addressing the MVR film of events, Holt allowed that Appellant's reverse lights were already on, showing he was backing out, when Holt pulled in to the parking lot (RR v. 4, p. 82). When asked about the LPD high-speed chase was, Holt seemed to reply that it was essentially open season on evading drivers; pursuit was permitted, although one was supposed to take general conditions into account (RR v. 4, p 84). The parked vehicles that Appellant hit were unoccupied (RR v. 4, p. 85).

On redirect Holt got in some hearsay/Confrontation Clause red zone material by stating without objection that LPD had "several calls" re a subject assaulting a female (RR v. 4 p. 88).

The State then addressed S2, the subject of Appellant's earlier hearsay and Confrontation Clause objections. Appellant re-urged them both and the Court summarily overruled them (RR v. 4, p. 89). The State proceeded to publish its S2, one of the 911 calls.

The State then called Sergeant Ryan Brumley (RR v. 4, p. 90). After a few preliminaries the State asked him about June 28, 2013. Brumley said that he was one of the participants (RR v. 4, p. 91). Brumley opined that the high-speed chase in question was warranted, especially in view of the fact that a female was in the car (RR v. 4, p. 92). Brumley was unfazed on cross when defense counsel pointed out that the female had exited after a certain point. He was apparently aware of this, but did not order the other officers to cease their pursuit. He made a command decision that it should continue (RR v. 4, pp. 93-94).

Officer Korie Archambault appeared next for the State (RR v. 4, p. 95). Archambault did not participate in the pursuit, but did in the creation of a perimeter (RR v. 4, pp. 95-96). His

17

FLIR device [a gizmo sensitive to thermal imaging] picked up the image of someone running, coming out of a lighted garage. Archambault caught the subject at about 2213 26th Street (RR v. 4, p. 97). Archambault tackled the subject and handcuffed him without incident (RR v. 4, pp. 97-98).

The State's last witness for its case-in-chief was Jeff Howell, an employee of Global Tel*Link, the provider for the inmate phone service at the Lubbock County Detention Center (RR v. 4, p. 101). Mr. Howell reminded all that every word of all the inmate calls are recorded [to use their Gargantuan quantity of indiscretions against them at their trials]. Mr. Howell was the custodian of records as to this material. Mr. Howell described the systemic use of the 6-digit LSL number [and/or a "pin number"] to identify the specific inmate talking. Howell stated that the system gives a prompt warning/reminder of that fact before either party talks, a warning that one would think would serve to dissuade the inmate from talking too much (RR v. 4, p. 102). Howell went on to authenticate S24, a compilation of Appellant's calls. Over a hearsay objection that was overruled, the Court admitted S24 and allowed its publication (RR v. 4, pp. 103-104).

The State then rested (RR v. 4, p. 104). Appellant made a motion for instructed verdict, arguing that the State had failed to prove up a lawful arrest, an element of the offense. The Court promptly overruled that motion (RR v. 4, p. 105). With the jury back in, Appellant rested, and both sides closed (RR v. 4, p. 106).

With the jury out, the Court and the parties discussed the guilt-innocence charge. The State asked for the inclusion of an instruction on "reasonable suspicion," and had some issues with the definition of a motor vehicle used in the charge (RR v. 4, pp. 106-107). Appellant suggested a charge or instruction on lawful detention. This included a definition of reasonable

suspicion, which the Court found "a little verbose." Further discussion ensued (RR v. 4, pp. 108-112). No written requested instruction pursuant to Article 36.15 appears in the Clerk's Record, so the cold record does not disclose what changes the parties were really kicking around. Appellant made no objection to the Court's Charge (RR v. 4, p. 113).

With the jury back in, the Court read its charge to them (RR v. 4, p. 114). During the State's opening summation, State's counsel said that as to the Deadly Weapon special issue, the State did not have to prove that Appellant had to intend to use it. Rather, the State had to prove only that "maybe" Appellant intended to use it. The Court overruled Appellant's objection (RR v. 4, p. 118). Appellant's summation addressed, mainly, the question of a lawful detention in the case and also the deadly weapon special issue (RR v. 4, pp. 120-122). During the State's closing summation, Appellant objected to what defense counsel regarded as improper argument. The State asked the jury, "…what do y'all want our police officers…to do [when getting two 911 phone calls]?" The Court overruled the objection (RR v. 4, p. 123). The State alluded to the contents of both 911 calls in closing summation (RR v. 4, p. 123). Discussing how the issue of the use of a deadly weapon was independent of the question of whether Appellant evaded detention, the State asserted that it had entered a certain map into evidence. Appellant demurred, and the Court overruled the objection (RR v. 4, p. 124).

After summation, the jury returned a verdict of guilty, and made an affirmative finding of the use of a deadly weapon by Appellant (RR v. 4, pp. 129-130).

Brief punishment proceedings before the Court began the same day. The State moved to admit S26, a pen packet pertaining to Cause No. 2004-404,928. The State likewise proffered its S27, a pen packet in Cause No. 90-411,277, an old conviction for Voluntary Manslaughter. The State then rested.

19

Appellant gave evidence, after being admonished (RR v. 4, pp. 133-135). Appellant completed only seventh grade, but got his GED in prison, at the age of about 19-20 (RR v. 4, p. 135). He dropped out of school due to drug abuse (RR v. 4, p. 136).

The trouble at the 7-Eleven on the night of June 28th began with Appellant's girlfriend making a phone call to one or more males (RR v. 4, p. 136). Appellant allowed that the matter developed into a severe verbal argument, but denied that it turned physical. Appellant was upset, and wanted to leave. Then, the police car pulled up behind him (RR v. 4, p. 137). Appellant again mentioned problems with drugs and alcohol, and denied intending to hurt anyone on the night in question (RR v. 4, p. 138).

Appellant served 12 years on a 20-year sentence for the Voluntary Manslaughter case. He was out for two years, and then caught a drug charge (RR v. 4, p. 139). Appellant briefly described his battles with himself and his awareness of the need for change (RR v. 4, p. 140). On cross the State established through testimony that the manslaughter charge had involved Appellant shooting one Angel Orozco with a shotgun, and that the drug conviction had been included an "intent to deliver" component (RR v. 4, pp. 141-142). Appellant served about 7 years of the 15-year drug sentence (RR v. 4, p. 144). Appellant admitted using alcohol, cocaine, and pills on the night of his arrest. In a jail call he had stated that he didn't remember the chase and the resulting accident (RR v. 4, p. 147). His nephew had been driving the car in question until they got to the 7-Eleven. At that point Appellant took the wheel (RR v. 4, pp. 147-148).

The defense rested, and both sides closed, after Appellant gave evidence (RR v. 4, p. 152). After summation from both sides, the Court sentenced Appellant to forty-five (45) years in the Texas Department of Corrections, Institutional Division (RR v. 45, p. 156). The Court duly admonished Appellant about his right to appeal (RR v. 4, pp. 156-157).

## SUMMARY OF THE ARGUMENT

In Point of Error One, Appellant avers that his movements were restrained and that he was unlawfully detained by the police officers on the occasion at issue, and that the scanty information available to the police did not provide them with reasonable suspicion to detain him. Thus, evidence of a "lawful detention," a requirement of Penal Code § 38.04 was wholly lacking at trial, and there was no legally sufficient evidence to show that the detention was lawful. Appellant also avers that this Court should refrain from finding that reasonable suspicion or probable cause to arrest developed during the pursuit, because such a holding would effectively edit out the requirement of a law detention pursuant to this law, giving the police *carte blanche* to criminalize innocent behavior under the Fourth Amendment, namely the termination of an encounter with the police and a constitutional seizure on their part that lacks a reasonable basis.

In Point of Error Two, Appellant complains of egregious charge error that was not preserved by timely objection at trial. More particularly, Appellant avers that the Trial Court committed reversible error by including a Special Issue permitting a Deadly Weapon finding by the jury. In a question of apparent first impression, Appellant asserts that the applicable statute, Penal Code § 38.04, is in tacit conflict with the general enabling statute that permits Deadly Weapon findings in state jail cases, Penal Code § 12.35(c)(1). The issue is one of statutory interpretation. The specific language in § 38.04(b)(2)(B) and (B)(3) should control over the general language of Penal Code § 12.35(c)(1). If Appellant prevails on this point, the charge as submitted contained egregious error, and a finding of harm is virtually assured, given the parole effects of a Deadly Weapon finding.

In Point of Error Three, Appellant complains of the introduction of hearsay in the form of a "911" tape admitted into evidence, this being S1. The Declarant, a Ms. Leyva, did not testify at trial. There was no showing of whether she was unavailable to testify. The State baldly

21

offered the exhibit at the beginning of guilt-innocence phase without advancing any argument as to why it should be admissible. The Trial Court promptly overruled Appellant's objection without requiring the State, as proponent, to make any argument or showing as to why it should be admissible. The recording tersely described what might have amounted to a minor assault and a vague description of an individual and a vehicle. Both of the main law enforcement witnesses at trial made rather disjointed and incomplete reference to what they were told when dispatched. The State alluded to both 911 calls in the case in its summation. Appellant avers that the erroneous introduction of S1 was harmful because it gave the jury an immediate and direct rationale it did not otherwise have for finding a lawful detention.

In Point of Error Four, Appellant complains of the introduction of hearsay in the form of a "911" tape admitted into evidence, this being S2, another 911 tape from a different declarant, a Mr. Glenn. This argument is functionally identical to that put forward in Point Three, only with reference to a distinct 911 tape.

In Point of Error Five, Appellant complains of the cumulative effects of the two errors complained of Points Three and Four, the erroneous introduction of the two hearsay 911 tapes. The issues in Points Three and Four are virtually functionally identical. Both concerned hearsay statements that individually and collectively gave the jury a basis, founded upon error, for finding that Appellant had been lawfully detained. Federal and Texas law now acknowledges the doctrine of cumulative error. Where found, cumulative error violates Due Process. The doctrine is peculiarly applicable to the situation complained of here, where two functionally identical hearsay items were admitted over objection.

## ARGUMENT AND AUTHORITIES

POINT ONE: THE TRIAL COURT ERRED IN LETTING THE CASE GO TO THE JURY ON GUILT-INNOCENCE, AS THE EVIDENCE WAS INSUFFICIENT TO SHOW A LAWFUL ARREST OR DETENTION.

*Applicable Portions of the Record*

The discussion of the record under the heading "Statement of Facts," *supra*, is incorporated by reference into this point as if set out at length.

The State's first witness at trial was the local "911" records custodian for the LPD communications center, Christy Hennsley. She authenticated two exhibits, both recordings of 911 calls pertaining to the case, which the State marked as S1 and S2. One of the officers who testified later in the trial, John Willhelm, identified one of the calls as coming from the 7-Eleven clerk at the store where all this started, Andrea Leyva (RR v. 4, p. 32). Willhelm identified Brendan [or "B. J."] Glenn as the other 911 caller. Both callers identified themselves on the 911 calls (RR v. 6, S1 and S2).

After Ms. Hennsley testified, the State offered S1 and S2. Appellant objected to both on, *inter alia*, hearsay grounds. Appellant initially entered a hearsay objection to both S1 and S2, and also claimed to have received only the call from Leyva (S1) in pretrial discovery. Over the hearsay objection, the Court admitted S1. The State proceeded to publish S1 (RR v. 4, pp. 15-16).

When the State called its next witness, Officer John Willhelm of LPD (RR v. 4, p. 17), he testified that he got a call from dispatch to the 7-Eleven at 2608 Ave. Q. From the context and contents of the two 911 calls, this must have resulted from Ms. Leyva's call, i.e., S1. According to her, a male and a female who had arrived in a blue pickup were supposedly arguing and/or physically fighting at the gas pumps. The male was Hispanic and wearing a red shirt (RR v. 4,

pp. 21-22). On arrival Willhelm did not see a blue pickup by the pumps or in the parking lot, but stated he saw one either on the east side of the building or elsewhere in or around the parking lot when he got out of his car. He immediately saw Officer Holt pull up behind a 2006 blue Chevy Trail Blazer [not a truck as Leyva said in S1] (RR v. 4, p. 22-23).

On cross, Willhelm said that he did not have his lights and sirens on when pulling into the 7-Eleven (RR v. 4, pp. 33-34). He saw nothing going on there (RR v. 4, p. 34). There were no vehicles were parked at the pumps, and there was no fight in progress (RR v. 4, pp. 34-35). No was trying to get his attention in any way, and there was no fight going on. He had only an uncorroborated complaint from some public-spirited individual (RR v. 4, p. 35).

On redirect Willhelm said that his only description of the vehicle was that it was a "blue pickup," and the only description of the suspect (?) was of a "Hispanic male wearing a red shirt" (RR v. 4, p. 36). Willhelm never testified to seeing a red shirt on Appellant or on anyone else.

Officer Charles Holt of LPD also testified, and was the main officer pursuing Appellant that night, at least initially. Holt said he got the same call sheet that Willhelm did, regarding a possible fight, with the subject in a blue vehicle (RR v. 4, pp. 40-41). He did not remember it as pertaining to a Hispanic male, and recalled no clothing description. He testified that when he got to the scene he saw a blue vehicle, and Willhelm was already there. Holt pulled behind the blue vehicle, which he described as a SUV (RR v. 4, pp. 41-42). He got behind it to block it (RR v. 4, p. 42). He could see Willhelm there too, already approaching Appellant's car (RR v. 4, p. 41-42).

At one point in his testimony, Holt authenticated the MVR [mobile video recorder] from his vehicle (RR v. 4, pp. 54-55). This item was admitted into evidence as S3, and the State proceeded to begin to publish it (RR v, 4, p. 55, RR v. 6, S3).

24

When crossed, Holt was not terribly clear about whether the video really showed the suspect vehicle Appellant's vehicle striking his, or just backing up to leave the parking area (RR v. 4, p. 79). Holt saw no brawl in progress on his arrival. No one was trying to get his attention. Looking at the video with everyone else, Holt admitted that Appellant's reverse lights were already on, showing he was backing out, when Holt pulled in to the parking lot (RR v. 4, p. 82).

After Holt's testimony, out of the presence of the jury, State re-offered and urged the admission of S2, one of the 911 calls. Appellant restated the earlier hearsay objection and added a *Crawford*-style Confrontation Clause objection, saying that the State apparently did not have a live witness to be cross-examined regarding the call (RR v. 4, p. 69). The State told the Court the call on S2 came from a B. J. Glenn. The Court initially sustained Appellant's objection as to S2, but eventually overruled it (RR v. 4, p. 71; RR v. 4, p. 73). The State did not immediately publish S2, but later did so over further objection (RR v. 4, p 89).

It can be determined from listening to S2, the 911 call made by B. J. [Brendan] Glenn that Officer Holt had pulled in and blocked Appellant's vehicle before hearing Glenn's call, since Glenn can be heard on the audio recording describing Holt doing so as it happened. Therefore, any reasonable suspicion had really to be based on the one call recorded and preserved as S1, the 911 call from the store clerk, Andrea Leyva.

S1 is not completely audible, at least to the undersigned, but in it Leyva described a couple arguing outside the store. She described the male as a Hispanic wearing a red shirt and glasses, and standing by a "blue truck." She said that the male was "pushing" and "getting rough" with the female. She said that the female wanted to leave, and the male was preventing her from doing so. She gave the police her phone number, and said that the female was wearing a colorful blue and white shirt.

25

Appellant made a motion for instructed verdict after the State rested, arguing that it had failed to prove a lawful arrest or detention. The Court overruled the motion (RR v. 4, p. 105).

*Standard of Review*

An appellate court reviews challenges to the legal sufficiency of the evidence under the standards of *Jackson v. Virginia*, 443 U.S. 307 (1979), and *Sims v. State*, 99 S.W.3d 600 (Tex. Crim. App. 2003). Insufficiency of the evidence implicates questions of due process of law under the Fourteenth Amendment to the U.S. Constitution. *Howeth v. State*, 645 S.W.2d 787, 788 (Tex. Crim. App. 1983.) If the appellant is correct on the no-evidence point, the appellate court must reverse and render judgment for the Appellant. *Ortiz v. State*, 577 S.W.2d 246, 250 (Tex. Crim. App. 1979.)

*Evading Arrest or Detention*

Appellant was indicted for Evading Arrest or Detention under Texas Penal Code § 38.04. The governing statute, by its terms, proscribes intentional flight from a law officer when that law officer is "attempting lawfully to arrest or detain" a person. TEXAS PENAL CODE § 38.04. The offense is thus defined as having as one of its elements a requirement that the arrest or detention be lawful. Under Penal Code § 38.04, one cannot do the usual pretrial motion to suppress complaining of an unconstitutional seizure of the person, or make any other pretrial attempt to get a ruling from a trial or appellate court on the issue. In *Woods v. State*, 153 S.W.3d 413, 415 (Tex. Crim. App. 2005), the Court of Criminal Appeals held this, saying the issue of the sufficiency of the evidence to show a seizure's legality or lack thereof cannot be raised in cases under this statute via a pretrial motion to suppress. The rationale is that under the circumstances the trial court is being asked to determine whether there is proof of an element of the offense, and that is not the purpose of a pretrial hearing. See *Pickens v. State*, 159 S.W.3d 272, 273-274

(Tex. App.—Amarillo, 2005, no pet.). The issue of evidence sufficiency as to a lawful arrest or detention must then be reserved for trial. Nevertheless, the case law of course uses the usual body of law that has developed under the Fourth Amendment.

*Applicable Law; Investigative Stop*

Appellant submits there was no question of probable cause to arrest him at the inception or genesis of this affair; therefore one must look at whether or not there was reasonable suspicion to detain him. A police officer may conduct a limited stop of an individual for the purpose of "investigation" where there is no probable cause for an arrest. *Terry v. Ohio*, 392 U.S. 1, 19-27 (1968).

Broadly, there are three types of interactions between police officers and citizens: (1) encounters; (2) investigative detentions; and (3) arrests. An encounter is not a seizure for Fourth Amendment purposes. *State v. Woodard*, 341 S.W.3d 404, 411-412 (Tex. Crim. App. 2011), *Johnson v. State*, 414 S.W.3d 184, 191 (Tex. Crim. App. 2013). An "encounter" is not subject to any Fourth Amendment restrictions. *State v. Garcia-Cantu*, 253 S.W.3d 236, 238 (Tex. Crim. App. 2008). There is no investigative stop unless a detention has occurred. *Forida v. Royer*, 460 U.S. 491, 497-498 (1983).

Under the Fourth Amendment, a police officer may conduct a limited stop of an individual for the purpose of investigation only if the officer making the stop has a reasonable suspicion, based on objective facts, that the individual is involved in criminal activity. *Brown v. Texas*, 433 U.S. 47, 52 (1979). A detention implicates the Fourth Amendment search and seizure restrictions and requires suspicion to support even a temporary seizure. *Garcia-Cantu*, *supra*, at 242.

The "reasonable suspicion" required must be based on articulable facts that lead to the reasonable conclusion that criminal activity is going on, and the detained person is connected

with the activity. *Armstrong v. State*, 550 S.W.2d 25, 30-31 (Crim. App. 1977). A person has the right to leave when approached by officers unless the officer has a reasonable suspicion of criminal activity before approaching. A person's attempt to walk away is insufficient to create reasonable suspicion. *Gurrola v. State*, 877 S.W.2d 300, 303 (Tex. Crim. App. 1994).

The question of whether an individual is detained or not (for the issue of distinguishing between an "encounter" or a "detention" within applicable Fourth Amendment law is sometimes a close one. One critical distinction between an "encounter" and a detention is that a detention has lost the consensual nature that characterizes the concept of an encounter. *Florida v. Bostick*, 501 U.S. 429 (1991). When an officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen, a Fourth Amendment seizure occurs. It occurs when, taking into account of all the circumstances surrounding the encounter, police conduct would communicate to a reasonable person that he was not at liberty to ignore the police presence and go away or otherwise terminate the encounter. *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010), *Garcia-Cantu*, *supra*, at 242. Each citizen-police encounter must be factually evaluated on its own terms. *Bostick*, *supra*, at 440.

### Information from Informant

Reasonable cause for an investigative stop can be based on information supplied by another person. *Milton v. State*, 549 S.W.2d 190 (Tex. Crim. App. 1977). *Milton* affirmed a conviction where the informant in question was known to be reliable and the police corroborated much of his information. *Id*. at 193-194. On the other hand, where the reliability of the source is not known and there is no information tending to corroborate the information, the result can differ. In *Conner v. State*, 712 S.W.2d 259, 263 (Tex. App.—Austin 1986, pet. ref'd), *rev'd on other grounds*, *Woods v. State*, 956 S.W.2d 33 (Tex. Crim. App. 1997), the Criminal Court held

that police officers could not detain a defendant based on a general tip from an informer who was not known to be reliable to the effect that the defendant had just made a drug sale. In *Stewart v. State*, 22 S.W.3d 646 (Tex. App.—Austin 1986, pet. ref'd), an uncorroborated anonymous tip concerning an intoxicated driver was held insufficient to justify an investigatory detention despite the public danger posed by intoxicated drivers. In *Pope v. State*, 695 S.W.2d 341, 344 (Tex. App.—Houston [1st Dist.] 1985, pet. ref'd), a third person's statement that the suspect might have a gun was not a reasonable basis for a detention. Information given in a face-to-face manner is considered more reliable, if detailed. *State v. Fudge*, 42 S.W.3d 226, 231 (Tex. App.—Austin 2001, pet. ref'd).

### Argument

Appellant avers that the initial contact with Officers Holt and Willhelm amounted to a "detention" and not an "encounter" as those words are understood in the context of Fourth Amendment terminology. Officer Holt's vehicle was partially blocking Appellant's vehicle, and Officer Willhelm was directly approaching him, at the time Appellant tried to leave. It has been held that a person is detained (despite officers telling him he was free to go) when officers have detained his vehicle. *Davis v. State*, 947 S.W.2d 240, 246 (Tex. Crim. App. 1997). In *Johnson*, *supra*, the Court of Criminal Appeals found that an investigative detention had occurred where the defendant's car was partially blocked by a police car, a light was shined in his car, and an officer asked the defendant why he was where he was and demanded proof of identification. *Id.* at 193. Since Appellant was detained, the officers conducting the stop needed "reasonable suspicion."

Appellant also avers that his attempted detention was not supported by reasonable suspicion. After listening to Mr. Glenn's 911 call, in which he describes the officers as already

being present in the course of his brief call, it would beggar credulity to ascribe any cause to the dispatch but the single call of Ms. Leyva. While Ms. Leyva was willing to identify herself, the record is silent as to any basis for ascribing reliability to her as a witness. Also, there is issue of the contents of her call. She describes the vehicle in question as being at the pumps, and as being a "blue truck." In fact, as the record shows, Appellant seems to have been driving a SUV. She described (at least arguably) not a full-scale Class A assault, but rather said that Appellant was pushing the subject, "getting rough" with her, and preventing her from leaving. When Willhelm got to the scene he did not see a blue pickup by the pumps or in the parking lot. There was no physical row in progress, and no one tried to get his attention. He said he saw Officer Holt pull up behind a blue Chevy Blazer. Holt for his part said that he did not remember the call as pertaining to a Hispanic male. He recalled no clothing description, and neither officer referred to what Appellant was wearing in testimony. Holt said that he got to the store, he saw Williams already present and a blue vehicle, which he described as an SUV.

Generally, where an initial detention is unlawful, any evidence seized subsequent to such determination is inadmissible. *Gurrola*, *supra*, at 302. The Exclusionary Rule and the concept of the "Fruit of the Poisonous Tree," in the peculiarly apt phrase, is too well known to require elaboration here.

Appellant is aware that there is intermediate court authority for the proposition that even if the initial attempt at detention is unlawful, the suspect may be stopped or arrested for criminal acts committed while attempting to avoid the officer. *Blount v. State*, 965 S.W.2d 53, 54-55 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd), *Picken*s, *supra*, at 274. This may be the coming trend. There is also contra case authority by implication, at least arguably. In *Rodriguez v. State*, 576 S.W.2d 419 (Tex. Crim. App. 1979), the Court of Criminal Appeals held that an

arrest arising out of a situation where the officer lacked reasonable suspicion to detain a defendant was unlawful. Admittedly, *Rodriguez* was decided before the statutory amendment to Penal Code § 38.04 that made it illegal to evade a law enforcement officer attempting to detain (as opposed to arrest) a subject. In *Rodriguez* the Court ended its review after deciding there was no reasonable suspicion, but alluded earlier in the opinion to an arrest arising out of the detention being "tainted," from the context meaning the 4th Amendment notion of "taint." *Id*. at 420. *Cook v. State*, 1 S.W.3d 722 (Tex. App.—El Paso 1999, no pet.), was a case that postdated the statutory change that proscribed evading detention as well as arrest. In *Cook*, the defendant was still allowed under then-prevailing law to present his challenge to the lawfulness of his detention via a motion to suppress. The El Paso Court, finding that the detention was unjustified, entered a judgment of acquittal. *Id*. at 726. It did this despite the claim by the arresting officer that the defendant had tried to hit him with his fist. *Id*. at 724. Appellant avers that to ignore the question of whether reasonable suspicion existed at the inception of the stop would be to vitiate the element in the statute requiring a "lawful" detention. Although the Exclusionary Rule pertains to suppressing evidence, the offense of Evading Arrest or Detention has become a sort of statutory hybrid, where the Exclusionary Rule and/or any suppression issue is built into the statute itself. Particularly given the fact that doing pretrial motions to suppress for this statute is currently "*auf strengstens verboten*," the "taint" concept should be applied, or the requirement of lawful arrests and detentions supposedly mandated by law will retain no real meaning.

*Harm Analysis*

Insufficiency of the evidence implicates questions of due process of law under the Fourteenth Amendment to the U.S. Constitution. *Howeth v. State*, 645 S.W.2d 787, 788 (Tex. Crim. App. 1983.) If the appellant is correct on the no-evidence point, the appellate court must reverse and render judgment for the Appellant. *Ortiz v. State*, 577 S.W.2d 246, 250 (Tex. Crim.

App. 1979).

POINT TWO: THE TRIAL COURT ERRED IN INCLUDING A SPECIAL ISSUE ON APPELLANT'S USE OR EXHIBITION OF A DEADLY WEAPON IN THE JURY CHARGE, EGREGIOUSLY HARMING APPELLANT, AS INCLUSION OF THE DEADLY WEAPON ISSUE VIOLATED LEGISLATIVE INTENT AS PER SECTION 38.04 OF THE PENAL CODE.

*The Record*

As re-indicted on July 2, 2014, the charging instrument in the instant case indicted Appellant for the vehicular version of Evading Arrest or Detention under § 38.04 of the Penal Code. The indictment included the allegation that on June 28, 2013, the occasion in question, Appellant "did then and there use and exhibit a deadly weapon, to-wit: motor vehicle, that in the manner of its use and intended use was capable of causing death and serious bodily injury" (CR p. 7).

Appellant made no objection to the Court's Charge (RR v. 4, p. 113). The charge for guilt-innocence phase included the following definition: "A 'deadly weapon' means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." "Serious bodily injury" was also defined as per the Penal Code (CR p. 111). The jury received a "special issue" on the question of the use or exhibition of a deadly weapon, and ample definitional material, along with being told to determine the question beyond a reasonable doubt. The jury made an affirmative finding (CR pp. 121-122).

*Standard of Review for Charge Error*

Article 36.19 of the Code of Criminal Procedure, entitled "Review of Charge on Appeal," defines the two basic standards of review for claimed charge error in this State. The seminal *Almanza* opinion held that two of the phrases used in the foregoing statute [i.e. "unless the error appearing from the record was calculated to injure the rights of defendant," and "unless it appears from the record that the defendant has not had a fair and impartial trial"] contained

standards for two different types of error, ordinary reversible error and also fundamental error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Which of the two standards is appropriate depends on whether a timely objection or requested special instruction preserved error to the charge at trial. The degree of harm necessary for reversal depends upon whether the error was preserved. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). In the event that error was not preserved, Article 36.19 mandates that there shall be no reversal "unless it appears from the record that the defendant has not had a fair and impartial trial."

With regard to error that was not preserved at trial, a reversal is warranted "only if the error is so egregious and created such harm that he [the defendant] has not had a fair and impartial trial." *Almanza, supra,* at 171. The phrase often remembered from the *Almanza* opinion, "egregious harm," is essentially another way of saying that the harm was so serious as to warrant being treated as "fundamental error." "Egregious harm is a difficult standard to meet and such a determination must be made on a case-by-case basis. Neither party bears the burden on appeal to show harm or a lack thereof under this statute." *Mendoza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 2014). The first step in any such analysis is to determine whether error exists, and then to analyze it for harm [under the appropriate standard]. *Middleton, supra*, at 453.

*Applicable Law on the Issue of Legislative Intent re the Deadly Weapon Finding*

Penal Code § 38.04 of the Penal Code was a Class B misdemeanor when the undersigned began practicing law. It has grown like Topsy. Originally entitled "Evading Arrest," the statute was amended by adding "or detain him for the purpose of questioning or investigating possible criminal activity" by the Legislature, effective September 1, 1989. See the discussion in *Rogers v. State*, 832 S.W.2d 442 (Tex. App.—Austin 1992, no pet.). In 2009 the Legislature amended § 38.04, changing the base offense from a class B misdemeanor to a class A misdemeanor, and

adding an additional ground for enhancement to the level of a state-jail felony. There were other substantive changes, notably in 2011 [and subsequently], all tending to greatly increase the possible penalties.

In *Patterson v. State*, 769 S.W.2d 938, 940 (Tex. Crim. App. 1989), the Court of Criminal Appeals held that all felonies are theoretically susceptible to an affirmative finding of use or exhibition of a deadly weapon. The Court also addressed the question of statutory interpretation, stating that the most common thread running through competing rules for statutory construction is for the judiciary to attempt to effectuate the intent of the Legislature. That remains the goal for all issues of statutory interpretation.

In *Anderson v. State*, 2004 WL 1202982 (Tex. App.—Tyler 2004, pet. ref'd), an unpublished opinion, the defendant was convicted of Evading Arrest or Detention with a vehicle and the judgment included a deadly weapon finding. On appeal the appellant argued that the finding of using a vehicle to evade arrest foreclosed the State's simultaneous use of that vehicle as a deadly weapon in order to enhance punishment. The Tyler Court found that the defendant made no such argument "when the jury charge was being prepared." The Tyler Court found that this meant waiver. The Court did not mention or apparently consider the possibility of fundamental error in the charge. In *Drichas v. State*, 175 S.W.3d 795 (Tex. Crim. App. 2005), the Court of Criminal Appeals upheld the application of the deadly weapon finding to § 38.04 (*Id*. at 798). At issue in *Drichas* was the question of the parameters of evidence sufficiency in terms of the factual record for making such a finding. The Court also held that a court of appeals could delete a deadly weapon finding from a judgment on a proper determination that the state failed to show it. *Id*. at 798, citing *Narron v. State*, 835 S.W.2d 642, 644 (Tex Crim. App. 1992).

In *State v. Brown*, 314 S.W.3d 487 (Tex. App.—Texarkana 2010, no pet.), the defendant presented a motion to quash in the trial court, arguing that the deadly-weapon allegation

contained in the charging instrument was improper. The basis of the argument was that the defendant under the offense as charged was already being penalized [through the enhancement from a class A misdemeanor to a state-jail felony] by the allegation of the use of a vehicle, and to add further punishment relating to the use of the vehicle was impermissible. The defendant claimed this was so since the use of the instrumentality found to be a deadly weapon was also an essential element of the offense as charged. The defendant/appellant in *Brown* added the argument that Penal Code § 38.03, defining the offense of Hindering Apprehension, specifically included a provision for enhancement based on the use of a deadly weapon, while 38.04 did not. *Id*. at 489. The Texarkana Court reviewed the matter *de novo*. *Id*. at 489. In deciding that the Evading statute could properly be the subject of a deadly weapon finding, it considered two other cases. One of them was *Martinez v. State*, 883 S.W.2d 771 (Tex. App.—Fort Worth 1994, pet. ref'd). In *Martinez*, the defendant was convicted of the offense (as it then existed) of Involuntary Manslaughter—Driving While Intoxicated. One of the 6 elements listed for that offense was the operation of a motor vehicle. The defendant advanced various arguments for the proposition that the State could not employ the use of a vehicle as an element in the offense while simultaneously making that fact the basis of its deadly weapon finding. One of the arguments was that "when a general provision conflicts with a special or local provision, the special or local provision controls unless there is a clear indication that the general provision is to control." He cited [*inter alia*] *Edwards v. State*, 313 S.W.2d 618, 619 (Tex. Crim. App. 1958), for this proposition. In *Edwards*, the Court held that where the statue provided for a range of punishment in DWI cases for enhancement purposes, that statute trumped the conflicting ranges of punishment in the general enhancement statue. The reviewing Court found the citation inapposite.

The judgment in this Cause reflects a conviction for a third-degree felony; Appellant

avers that pursuant to § 38.04(b)(1)(B) and § 12.35(c)(1) in fact he was convicted of a state jail felony that was punishable as a third degree felony. In *Garza v. State*, 298 S.W.3d 837, 844-845 (Tex. App.—Amarillo 2009, no pet.), this Court exercised its power to modify an incorrect judgment when the necessary information and evidence is available and Appellant requests it here.

Penal Code § 12.35(c)(1) is the statutory source for the State's addition of a deadly weapon allegation. It must be said that by its plain language (of all-encompassing breadth) it facially affects every state jail penal offense known to Texas. One expects its extension to at least Class "A" misdemeanors at any moment. The Evading Arrest or Detention statute also has its own thematically similar internal scheme, set out in § 38.04(b)(2)(B) and (B)(3). The former makes it a third-degree felony if another suffers serious bodily injury in the course of an evading episode, and the latter makes it a second-degree felony if another suffers death in such an episode.

*Argument*

In the instant case, Appellant advances an argument **distinct from** the main argument produced by the defendant in *Brown*, *supra*, and the main argument produced by the defendant in *Martinez*, *supra*. Appellant's argument is based on statutory interpretation, and is broadly similar to the one put forward in *Edwards*, *supra*, allowing for the difference in subject matter. Appellant avers that since § 38.04(b)(2)(B) and (B)(3) contain the statute's own internal punishment scheme for serious injuries or death inflicted in an evading episode, that specific statutory provision ought to control over the very general statutory scheme set out in Penal Code § 12.35(c)(1). "…When a general provision conflicts with a special or local provision, the special or local provision controls unless there is a clear indication that the general provision is to control…" While the conflict between the two statutes is not direct, § 38.04 does have its own

36

internal treatment of cases where injury or death occur as a result of the conduct proscribed, and the specific statute should control.

*Argument as to Error; Harm*

In the unlikely event of Appellant's argument, *supra*, finding favor, that amounts to a finding that the submission of the special issue in the charge was error. The harm from the inclusion of the Deadly Weapon special issue is then patent. If the finding was not permissible, Appellant suffered egregious harm from the effects of the finding on his parole status. Appellant submits that the proper remedy, in this instance, would be either to reverse and remand or possibly to delete the deadly weapon finding from a judgment as per the holding in *Narron, supra.*

POINT THREE: THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY, S1, A RECORDING OF A 911 CALL, THEREBY HARMING APPELLANT.

*The Record*

The discussion of the record given *supra* under the heading "Statement of Facts" and also as given in Appellant's first and second points, *supra*, are incorporated by reference into this point as if set out at length.

Again, the State's first witness at trial was the 911 records custodian. The State then moved to admit S1, reserving the matter of S2. Over the hearsay objection, the Court admitted S1. The State proceeded to publish S1 (RR v. 4, pp. 15-16).

Both Willhelm and Holt, the two main officers present that night, made some references to the dispatch calls based on the 911 calls. Willhelm got a call to the 7-Eleven at 2608 Ave. Q at about 2:40 in the morning   A male and a female in a blue pickup were supposedly arguing and/or physically fighting at the gas pumps. The male was Hispanic and wearing a red shirt (RR v. 4, pp. 21-22). Again, Holt got the same call sheet as Willhelm regarding a possible fight, with

a subject in a blue vehicle (RR v. 4, pp. 40-41). Holt did not remember it as pertaining to a Hispanic male, and Holt recalled no clothing description. On redirect Holt made a reference to "several calls" LPD had gotten re a subject assaulting a female (RR v. 4 p. 88).

The Court's charge, in the application paragraph, naturally included the requirement that, to convict, the jury had to find that law enforcement "was attempting lawfully to arrest or detain" Appellant (CR p. 112). Paragraph 6 of the charge included an instruction under Art. 38.23 of the Code of Criminal Procedure, along with instructions telling the jury when a law enforcement operative is permitted to temporarily detain a person, and the definition of "reasonable suspicion" as a Fourth Amendment term of art. The conclusion of the paragraph instructed the jury to disregard evidence unlawfully obtained, an instruction perhaps more appropriate for the usual sort of 38.23 instruction and situation.

Later, during the State's closing summation, Appellant objected to what defense counsel regarded as improper argument. The State asked the jury, "…what do y'all want our police officers…to do when they get not one phone call from 911 but two phone calls--" [Appellant objected at this point.] The Court overruled the objection (RR v. 4, p. 123). The State alluded to the contents of both 911 calls in closing summation (RR v. 4, p. 123).

The record is silent as to why Ms. Leyva and Mr. Glenn were unavailable to testify, if they were.

*Question of Preservation of Error*

A general objection based on hearsay is sufficiently specific to require appellate review except under the most unusual circumstances. *Langston v. State*, 827 S.W.2d 907, 910 (Tex. Crim. App. 1992). Once a defendant preserves error by making a hearsay objection, the burden then shifts to the state to show that the evidence is admissible pursuant to some exception to the

hearsay rule. *Patterson v. State*, 980 S.W.2d 529 (Tex. App.—Beaumont 1998, no pet.). *Patterson* also held that the trial judge erroneously admitted hearsay testimony even though it may ultimately have been admissible, since the court immediately overruled the objection without giving the State an opportunity to indicate whether an exception was applicable. *Id.* at 532-533.

*Standard of Review for Finding Error in Admission of Evidence*

A trial court's decision to admit or exclude evidence is reviewed under an abuse-of-discretion standard. That is, the reviewing court will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

*Applicable Law; Issue of Error*

"Hearsay" is defined in T.R.E. 801 [along with extensive definitional material as to what is *not* hearsay, of course] and its use generally proscribed by T.R.E. 802. TEX. R. EVID. 801, 802. Generally, hearsay is evidence of a statement made out of court that is offered for the purpose of proving the truth of the statement. *Girard v. State*, 631 S.W.2d 162, 164 (Tex. Crim. App. 1982).

In *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995), the Court of Criminal Appeals held that "An extrajudicial statement or writing which is offered for the purpose of showing what was said rather than for the truth of the matter stated therein does not constitute hearsay." *Dinkins* also held that a police officer's statement may be inadmissible hearsay, but that an officer may describe statements made by others for the purpose of showing why the defendant became a suspect. *Id.* at 347. The dividing line may not be clear. Often, of course, the proponent will make a claim that it is offering hearsay not for the truth of matter asserted, but

39

for some other reason. That is a very good way to get many judges to admit hearsay testimony. See *Urick v. State*, 662 S.W.2d 348, 349 (Tex. Crim. App. 1984). In *Lacaze v. State*, 346 S.W.3d 113 (Tex. App.—Houston 2011, pet. ref'd), the Trial Court, relying on *Dinkins*, *supra*, allowed an investigating officer to wallow through a veritable Walpurgis Nacht or Saturnalia of arguably inadmissible hearsay, recounting his conversations with previous suspects, to show why the hapless defendant was now the favorite. *Id*. at 120-121. Likewise, in *Lyle v. State*, 418 S.W.3d 901 (Tex. App.—Houston (14th Dist.) 2013, no pet.) the Houston Court affirmed the use of out-of-court statements addressed by an investigating officer who was allowed to testify that he got a "telephone report of a DWI." The Court ruled that the testimony was admitted to show why the defendant had become a suspect rather than for its truth. *Id*. at 904.

Another first-class device for getting hearsay testimony into a trial, or excusing once it is in, is to pretend or claim that it is simply not hearsay at all, or to make a broad statement that it is admissible without really giving a reason, thereby doing, arguably, an end run around the obvious language of T.R.E. 801. That rule contains and defines numerous forms of out-of-court statements that are in fact hearsay on some level but are defined as not being hearsay. See TEX. R. EVID. 801(e). For example, T.R.E. 801(e) does not define out-of-court statements made to law enforcement by informants, "snitches," 911 callers, or other individuals talking to cops who are absent from trial as being non-hearsay. However, appellate opinions doing so are numerous. In *McVickers v. State*, 874 S.W.2d 662, 664 (Tex. Crim. App. 1993), the Court of Criminal Appeals held that hearsay is generally admissible to determine whether reasonable suspicion existed for a stop. See also *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

Appellant submits that the admission of S1 was error under Rule 801, plain and simple. Generally, 911 calls are held not to be "testimonial" [and therefore are admissible] within the meaning of *Crawford v. Washington*, 541 U.S. 36 (2004) and its holding, based on the

Confrontation Clause of the 6th Amendment. Nothing in the Texas rules excuses 911 calls from the effects of Rule 801, except arguably as "excited utterance" under T.R.E. 803(2). The State did not provide any foundation or predicate for the admission of the recording under this hearsay exception, and Ms. Leyva can be heard on it, sounding by her tone as if she is ordering a pizza at a restaurant she doesn't particularly like.

*Standard of Review for Harm Analysis*

Admission of inadmissible hearsay is non-constitutional error. *Lacaze*, *supra*, at 122. The applicable rule for determination of non-constitutional error is TRAP 44.2(b), which contains the applicable standard of review for harm analysis involving non-constitutional error. "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "Substantial rights" are affected when the error complained of has a substantial and injurious effect or influence in determining the jury's verdict. *Barshaw v. State*, 342 S.W.3d 91, 93-94 (Tex. Crim. App. 2011). In making this determination, the reviewing court must review the record as a whole. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998), *Klein v. S*tate, 191 S.W.3d 766 (Tex. App.—Fort Worth, no pet.) The strength of the evidence of guilt, especially if it is overwhelming, is a factor to be considered. *Motilla v. State*, 78 S.W.3d 353, 355-7 (Tex. Crim. App. 2002). If there is "grave doubt" about whether the error did not affect the outcome, then the error is treated as if it did. *Thomas v. State*, 137 S.W.3d 792, 796 (Tex. App.--Waco 2004, no pet.), *Fowler v. State*, 958 S.W.2d 853, 865 (Tex. App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999).

The requirement that an appellate court must ignore a non-constitutional error that does not affect a substantial right does not create any presumption about whether the error is reversible. *Garza v. State*, 988 S.W.2d 352, (Tex. App.—Fort Worth 1999), *rev'd on other*

*grounds*, 7 S.W.3d 164. Neither party has the burden of proof when an appellate court conducts harmless error review of non-constitutional trial error. *Fowler*, *supra*.

*Question of Harm*

Appellant is mindful of the fact that Willhelm and Holt, the two main police witnesses, made reference to what they were told by dispatch on their way to the scene. Although S1 [Leyva] was the only 911 tape really relevant to the issue of reasonable suspicion, due to the timing involved, both 911 tapes were admitted. Willhelm and Holt were both rather vague about what they were told; the main points were the location at a certain store and a certain blue vehicle, which they were told by Leyva was a truck.

Evading Arrest or Detention is the only offense in the Penal Code the undersigned is aware of that has a "built-in" requirement that the arrest or detention involved be "lawful." The requirement that it be "lawful" is an element of the statute. TEX. PENAL CODE § 38.04. Appellant avers that he was harmed within the meaning of T.R.A.P. 44.2(b) by the erroneous introduction into evidence of the 911 tape, since that tape (along with S2; see the next point of error) gave the jury, rightly or wrongly, the decisive evidence it used to resolve the question of whether Appellant's detention was lawful. The State took care to refer to it in summation (RR v. 4, p. 123).

In *Woods, supra,* at 415, the Court of Criminal Appeals held that the issue of the sufficiency of the evidence to show a seizure's legality or lack thereof cannot be raised in cases under this statute by a pretrial motion to suppress. The rationale is that under the circumstances the trial court is being asked to determine whether there is proof of an element of the offense. To allow into evidence hearsay of the sort complained of here, in this instance a 911 tape, is to allow trials of an offense now very serious to be resolved by incompetent testimony, and ought to be of

equal concern. Appellant avers that the error complained of had a substantial and injurious effect or influence in determining the jury's verdict, as per *Barshaw, supra.*

POINT FOUR: THE TRIAL COURT ERRED BY ADMITTING INADMISSIBLE HEARSAY, S2, A RECORDING OF A 911 CALL, THEREBY HARMING APPELLANT.

### *The Record*

The discussion of the record given *supra* under the heading "Statement of Facts" and also as given in Appellant's first, second and third points, *supra*, are incorporated by reference into this point as if set out at length.

The State had originally offered S2 at about the beginning of trial. After an objection to Sq2, the State went ahead and offered and published S1 (RR v. 4, pp. 15-16). Later in the trial, the State re-offered and urged the admission of S2, the second of the 911 calls in the case. Appellant restated the hearsay objection and added a *Crawford*-style Confrontation Clause objection (RR v. 4, p. 69). The State described the call as coming from a spectator to the physical fight in the parking lot of the convenience store, whom it identified as B. J. Glenn, The Court hesitated, but ended by overruling Appellant's objections to the item being put before the jury (RR v. 4, p. 73). After some delay, the State proceeded to publish S2.

### *Law and Argument*

Appellant submits that this fourth point of error is largely indistinguishable in law and fact from his third point of error, except that a second 911 recording (this one made by Mr. Glenn and not Ms. Leyva) is at issue. Appellant incorporates into this point his entire discussion of the law, the facts, and the argument from his third point of error, including but not limited to all matters stated under the headings, "*Question of Preservation of Error*," "*Standard of Review for Finding Error in Admission of Evidence*," "*Applicable Law; Issue of Error*," and "*Standard of Review for Harm Analysis*." Appellant also incorporates by reference the argument given

under the heading "*Question of Harm*," *supra*, substituting the S2 911 tape for S1.

POINT FIVE. THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHTS BY COMMITTING TWO SERIOUS ERRORS IN THE CONDUCT OF THE GUILT-INNOCENCE TRIAL THAT COLLECTIVELY AMOUNTED TO CUMULATIVE ERROR.

*Errors Complained of Herein*

Appellant's previous Points of Error Three and Four are incorporated by reference into this point in their entirety. Appellant avers that the errors complained of in Points Three and Four, i.e. the improper introduction of two 911 recordings that were inadmissible hearsay, collectively amounted to cumulative error. Taken in tandem or as a unity they provided evidence relied upon by the jury for making its finding of a lawful detention.

*Cumulative Error*

Federal law has recognized the doctrine of cumulative error. In *U.S. v. Canales*, 744 F.2d 413 (5th Cir. 1984, rehearing denied), the Fifth Circuit held that the cumulative effect of several incidents (there, of improper argument) could warrant reversal even though no single one of the offenses would. Under this doctrine, an aggregation of non-reversible errors, although individually harmless, can yield a denial of the constitutional right to a fair trial, calling for reversal. *U.S. v. Munoz*, 150 F.3d 401, (5th Cir. 1998, rehearing denied). Admittedly, this situation is somewhat rare. *U.S. v. Reedy*, 304 F.3d 358 (5th Cir. 2002, rehearing denied). However, on occasion, reversal is warranted in this situation. See *U.S. v. Diharce-Estrada*, 526 F.2d 637 (5th Cir. 1976), reversing for the cumulative effect of four enumerated variable errors. Cumulative error, if sufficiently weighty, violates Due Process of the Fifth Amendment, as applied to the States by the Fourteenth Amendment. See *Menzies v. Procunier*, 743 F.2d 281 (5th Cir.1985), a writ case finding significant cumulative effect improper jury argument linked with error regarding the admission of extraneous offenses.

Somewhat belatedly, the state case law has acknowledged the doctrine of cumulative error. In *Chamberlain v. State,* 998 S.W.2d 230, 238 (Tex. Crim. App. 1999), *cert. den.* 528 U.S. 1082 (2000), the Court of Criminal Appeals held that cumulative error sometimes necessitates reversal. See also *Wright v. State*, 28 S.W.3d 526 (Tex. Crim. App. 2000), and *Feldman v. State*, 71 S.W.3d 738 (Tex. Crim. App. 2002).

*Harm*

The two errors were virtually identical conceptually, and both amounted to inadmissible proof of an element of the offense, namely the requirement of TEX. PENAL CODE § 38.04 that a detention or arrest be lawful, for an offense to occur. The two errors complained of herein amount to a violation of Appellant's Due Process rights. Appellant avers that all the two exhibits improperly admitted, with the their effects on the jury, rise to the level of a constitutional violation under the doctrine of cumulative error. The applicable harm analysis should be under that of T.R.A.P. 44.2(a) for constitutional errors. The appellate court must reverse "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a).

## CONCLUSION AND PRAYER

**Conclusion**

For the reasons stated above, Appellant avers that reversible error has been committed as to the sole count of the indictment as described herein.

**Prayer**

WHEREFORE, PREMISES CONSIDERED, Appellant prays that should he prevail on his first point of error, that this Court reverse the judgment of the Trial Court and enter a judgment of acquittal. Should Appellant prevail on his second point of error, he prays that this Court will reverse the judgment of the Trial Court and remand the Cause, or in the alternative, delete the Deadly Weapon finding from the judgment. Should Appellant prevail on any of his other points of error, he prays that this Court reverse the judgment of the Trial Court and remand the Cause for a new trial.

Pursuant to this Court's holding in *Garza v. State*, 298 S.W.3d 837, 844-845 (Tex. App.—Amarillo 2009, no pet.), Appellant prays that this Court exercise its power [pursuant to Tex. R. App. P. 43.2(b)] to reform the Trial Court's judgment to reflect that Appellant was actually convicted of a state jail felony, and not a third degree felony, should this Court so find. (See CR p. 123). Appellant prays that he be granted such other and further relief, in law or in equity, to which he may be justly entitled.

Respectfully submitted,

By:_ /s/ Karen Jordan
KAREN JORDAN

ATTORNEY FOR THE APPELLANT
SBN: 11004950
CROOK & JORDAN

PO Box 94590
Lubbock, TX 79493
(806) 744-2082
dcrook@nts-online.net
FAX:  (806) 744-2083

## CERTIFICATE OF COMPLIANCE RE T.R.A.P. 9.4(i)(3)

This is to certify that the length of the foregoing Appellant's Brief is 12,076 words, as given in the word count of the computer program used to prepare this document.  This total is within the maximum length prescribed for a brief for a non-capital case pursuant to T.R.A.P. 9.4(i)(2)(B).

/s/ Karen Jordan
KAREN JORDAN

## CERTIFICATE OF SERVICE

This is to certify that a copy of the above-entitled and numbered brief has been served on Mr. Jeff Ford, Asst. Criminal District Attorney, Lubbock County, and counsel for Appellee as to this appeal, by e-mailing to Mr. Ford's E-Mail address to the office of the District Attorney of Lubbock County, Appellate Division, on this the 16th day of March, 2015.

/s/ Karen Jordan
KAREN JORDAN
ATTORNEY FOR APPELLANT
SBN:  05109530
CROOK & JORDAN
PO Box 94590
Lubbock, TX 79493
(806) 744-2082
FAX:  (806) 744-2083
dcrook@nts-online.net